## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RAFAEL ALCANTARILLA and JEAN ALCANTARILLA, *his wife*,<br><br>Plaintiffs,<br><br>v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and ALLAN GRAY,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) **2:15-cv-1155** |

### <u>MEMORANDUM OPINION</u>

The following motions are pending before the Court:

(1) the MOTION TO DISMISS PLAINTIFF'S COMPLAINT AGAINST ALLAN GRAY (ECF No. 9) filed, along with a brief in support (ECF No. 10), by Defendant Allan Gray;

(2) the MOTION TO DISMISS (ECF No. 11) filed, along with a brief in support (ECF No. 12) by Defendant State Farm Mutual Automobile Insurance Company ("State Farm"); and

(3) the MOTION TO TRANSFER VENUE AS TO STATE FARM (ECF No. 13), along with a brief in support (ECF No. 14).

Plaintiffs, Rafael Alcantarilla and Jean Alcantarilla, filed responses, along with briefs in support thereof, to each of Defendants' motions. (ECF Nos. 18-23). Defendants filed reply briefs in support of the motions to dismiss filed by the respective Defendants. (ECF Nos. 24). Accordingly, the motions have been fully briefed and are ripe for disposition.

## I.  <u>Background</u>

This case arises out of a claim for underinsured motorist ("UIM") coverage benefits filed by Plaintiffs. On March 24, 2014, Plaintiffs, while residents of North Carolina, renewed their auto insurance policy with State Farm, through its agent, Defendant Gray. Defendant Gray is a

North Carolina resident, who is only licensed to sell auto insurance in North Carolina. The policy was in effect from March 24, 2014, to September 24, 2014. Under the policy, Plaintiffs had combined uninsured/underinsured motorist benefits of $100,000 per individual and $300,000 per accident. The cover page identifies the policy as a "**North Carolina**" policy, and the policy contains a choice-of-law provision which provides that "[t]his policy is issued in accordance with the laws of North Carolina and covers property or risks principally located in North Carolina. Any and all claims or disputes in any way related to this policy shall be governed by the laws of North Carolina." Ex. A at 20. Furthermore, the policy defines "underinsured motor vehicle" as:

> **Underinsured motor vehicle** means a land motor vehicle or trailer of any type:
> 1.   The ownership, maintenance or use of which is insured or bonded for liability at the time of the accident; and
> 2.   The sum of the limits of liability under all bodily injury liability bonds and insurance policies applicable at the time of the accident is equal to or greater than the minimum limit specified by the financial responsibility law of North Carolina and:
>      a.   is less than the limit of liability for this coverage; or
>      b.   the total limit of liability available has been reduced to less than the limit of liability for this coverage by payment of damages to other persons.

Ex. A. at 10. This definition is consistent with North Carolina law regarding the definition of "underinsured motorist."

Sometime in the spring of 2014, Plaintiffs placed their home in North Carolina for sale, and on May 23, 2014, they moved to Pennsylvania in pursuit of an employment opportunity for Rafael Alcantarilla. Prior to the move, Jean Alcantarilla informed Defendant Gray's office manager, Jamie McMillian, that Plaintiffs were leaving North Carolina permanently. Ms. McMillian allegedly informed Jean Alcantarilla that nothing needed to be done with regard to the policy since the annual renewal date was only a few months away. After leaving North Carolina,

Plaintiffs provided State Farm with their new address in Pennsylvania. Plaintiffs' monthly bills were thereafter sent to their Pennsylvania address, and all premium payments from May 2014 through September 2014 were paid by Plaintiffs from Pennsylvania.

On July 14, 2014, Rafael Alcantarilla was hit by a vehicle while crossing a street in downtown Pittsburgh. He sustained serious injuries and eventually settled with the driver of the vehicle that hit him for the driver's liability limit of $100,000. He also obtained first-party medical benefits under his own insurance policy for $5,000.00. The remainder of his medical bills was paid by a combination of Ohio and Pennsylvania Medicaid.

Because his medical expenses exceeded the amount recovered from the driver that struck him, Rafael Alcantarilla made a claim for UIM benefits under his insurance policy. State Farm refused to pay, taking the position that the driver of the vehicle was not "underinsured," as the term is defined by the policy, because Plaintiffs' UIM coverage did not exceed the driver's policy limit.

Plaintiffs filed suit in this Court on September 2, 2015. The gravamen of their claims is that while the decision to deny UIM coverage might be correct under North Carolina law and the terms of the policy, Pennsylvania's more expansive definition of "underinsured" should be applied, which would thereby entitle them to $100,000 in UIM coverage. As they put it, "[s]ince Rafael Alcantarilla's injuries, lost wages, remaining medical bills, when combined, exceeded $100,000.00, the driver of the vehicle which struck Rafael Alcantarilla lacked adequate insurance coverage to pay the losses and damages of Rafael and Jean Alcantarilla." Compl. ¶ 46, ECF No. 1. They argue, in the alternative, that if Pennsylvania law does not apply, then State Farm, through Defendant Gray, misrepresented to them that nothing needed to be done to bring the policy into compliance with Pennsylvania law prior to their move. Counts I and II of their

complaint set forth breach of contract claims against State Farm. Counts III, IV, and V, which are pled in the alternative, are a "failure to procure insurance" claim, a Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCL"), 73 P.S. § 201.1 *et seq.*, claim, and a breach of fiduciary duty claim against State Farm and Defendant Gray.

## II.    Defendant Gray's Motion to Dismiss

Defendant Gray moves to dismiss the claims asserted against him for lack of personal jurisdiction and improper venue. Without conceding that jurisdiction exists, Defendant Gray proceeds to argue that the UTPCPL and breach of fiduciary duty claims should be dismissed for failure to state a claim. Because this Court finds that personal jurisdiction is lacking, it will not address the additional arguments raised by Defendant Gray. *See Leroy v. Great W. United Corp.*, 443 U.S. 173, 180 (1979) (citations omitted) ("The question of personal jurisdiction, which goes to the court's power to exercise control over the parties, is typically decided in advance of venue, which is primarily a matter of choosing a convenient forum.").

### A.    Legal Standard

Once a jurisdictional defense is raised, the plaintiff bears the burden of proving, through affidavits or other competent evidence, sufficient contacts with the forum state to establish personal jurisdiction. *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 257 (3d Cir. 1998). Rather than relying on the general averments in the pleadings, the plaintiff must establish those contacts with reasonable particularity. *Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir. 1996). In ruling on a motion to dismiss for lack of personal jurisdiction, "[t]he Court must accept the plaintiff's allegations as true and construe disputed facts in his favor." *Stillwagon v. Innsbrook Golf & Marina, LLC*, No. 2:11-cv-1338, 2012 WL 501685, at *2 (W.D. Pa. Feb. 12, 2012).

"Under Federal Rule of Civil Procedure 4(e), a federal district court may assert personal jurisdiction over a nonresident of the state in which the court sits to the extent authorized by the law of that state." *Eurofins Pharma U.S. Holdings v. BioAlliance Pharma S.A.*, 623 F.3d 147, 155 (3d Cir. 2010). Pennsylvania's long-arm statute provides that the Court may exercise personal jurisdiction over non-residents "to the fullest extent allowed under the Constitution of the United States" and "based on the most minimum contact with [the] Commonwealth allowed under the Constitution of the United States." 42 Pa. C.S. § 5322(b). Therefore, the Court must consider "the relationship among the defendant, the forum, and the litigation" in order to determine if personal jurisdiction exists under the precepts of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *IMO Indus.*, 155 F.3d at 259 (citing *Shaffer v. Heitner*, 433 U.S. 186 (1977)).

Due process requires that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Supreme Court has explained that "minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Asahi Metal Indus. Co., Ltd. v. Super. Ct. of California*, 480 U.S. 102, 109 (1987) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "Having minimum contacts with another state provides 'fair warning' to a defendant that he or she may be subject to suit in that state." *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (quoting *Burger King*, 471 U.S. at 472) (some quotation marks omitted).

Personal jurisdiction may be exercised under two distinct theories. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). General jurisdiction is based upon the defendant's "continuous

and systematic" contacts with the forum and may exist even if the plaintiff's claim arises from the defendant's non-forum related activities. *Id.* Specific jurisdiction, on the other hand, exists only "when the claim arises from or relates to conduct purposely directed at the forum state." *Kehm Oil Co. v. Texaco, Inc.*, 537 F.3d 290, 300 (3d Cir. 2008). Plaintiffs do not argue that the Court has general jurisdiction over Defendant Gray. Accordingly, this Court will confine its analysis to the question of whether specific jurisdiction exists. *See Pennzoil Prods. Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 200-01 (3d Cir. 1998) ("[N]o party in this case contends that there is a basis for general jurisdiction in Pennsylvania – so we are free to consider solely whether the alternative form of personal jurisdiction is present: specific personal jurisdiction.").

To decide whether specific jurisdiction exists, the Court must "undertake a three-part inquiry." *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009). "First, the defendant must have 'purposefully directed [his] activities' at the forum." *Id.* (quoting *Burger King*, 471 U.S. at 472). "Second, the litigation must arise out of or relate to" the defendant's forum-directed activities. *Id.* (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007)). "And third, if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise 'comport[s] with "fair play and substantial justice."'" *Id.* (quoting *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320)). The latter standard is discretionary, but the Court of Appeals for the Third Circuit has "generally chosen to engage in [it]." *Pennzoil*, 149 F.3d at 201 (citations omitted).

"The threshold requirement is that the defendant must have 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State.'" *D'Jamoos*, 566 F.3d at 103 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). A defendant need not be physically

present in the forum to satisfy this requirement. *Id.* (citing *Burger King*, 471 U.S. at 476; *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993)). "But what is necessary is a deliberate targeting of the forum. Thus, the 'unilateral activity of those who claim some relationship with a nonresident defendant' is insufficient." *O'Connor*, 496 F.3d at 317 (quoting *Hanson*, 357 U.S. at 253). "And contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself." *Id.* (citing *Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 542-43 (3d Cir. 1985)). As the Supreme Court has explained, "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King*, 471 U.S. at 462. In such case, it is not unreasonable to require a contracting party who "'deliberately' [] engaged in significant activity within a State . . . or has created 'continuing obligations' between himself and residents of the forum," to submit to suit in that forum as well. *Id.* at 475-76 (citations omitted).

"A slightly refined version of this test applies to intentional tort claims." *O'Connor*, 496 F.3d at 317 n.2 (citing *Calder v. Jones*, 465 U.S. 783 (1984); *IMO Indus.*, 155 F.3d at 254). Under what has come to be known as the "effects test," derived from the Supreme Court's decision in *Calder*, 465 U.S. at 788-90, "an intentional tort directed at the plaintiff and having sufficient impact upon it in the forum may suffice to enhance otherwise insufficient contacts such that the 'minimum contacts' prong of the Due Process test is satisfied." *Imo Indus.*, 155 F.3d at 260 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)). To establish specific jurisdiction under the *Calder* "effects test," a plaintiff must prove that:

(1) The defendant committed an intentional tort;

(2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that

tort;

(3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.

*Id.* at 265-66.

Although the "effects test" provides an alternative avenue for establishing specific jurisdiction, the Court of Appeals has interpreted it narrowly. *See id.* at 265. As the Court of Appeals has emphasized, "*Calder* did not change the fact that even in intentional tort cases the jurisdictional inquiry focuses on the relations among the defendant, the forum, and the litigation," and "[n]or did *Calder* carve out a special intentional torts exception . . . , so that a plaintiff could always sue in his or her home state." *Id. Calder* did, however, "recognize that under certain circumstances, the 'plaintiff's residence in the forum may, because of the defendant's relationship with the plaintiff, enhance the defendant's contacts with the forum." *Id.* (quoting *Keeton*, 465 U.S. at 780). That is, "plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises."

Accordingly, "the *Calder* 'effects test' can only be satisfied if the plaintiff can point to contacts which demonstrate that the defendant *expressly aimed* its tortious conduct at the forum, and thereby made the forum the focal point of the tortious activity." *Id.* at 265 (emphasis in original). Generally, "this will require some type of 'entry' into the forum state by the defendant." *Id.* "While knowledge that the plaintiff is located in the forum is necessary to the application of *Calder*," knowledge "alone is insufficient to satisfy the targeting prong of the effects test." *Id.*

**B.** **Discussion**

It is undisputed that Defendant Gray is a North Carolina resident who is only licensed to sell insurance in North Carolina. He has never travelled to Pennsylvania, does not advertise in

Pennsylvania, does not service insurance policies on behalf of Pennsylvania residents, does not employ anyone in Pennsylvania, and has never sold a policy that provided coverage to a vehicle that was registered or garaged in Pennsylvania at the time of the sale. It is also undisputed that Plaintiffs' policy was issued to Plaintiffs at their address in North Carolina and provided coverage for Plaintiffs' 2003 Toyota Camry, which, at the time, was registered and garaged at Plaintiffs' North Carolina residence.[1] Plaintiffs, however, rely on the following factual allegations in support of their assertion that personal jurisdiction exists:

> As set forth in the Complaint, several telephone calls were made to and from Pennsylvania between the [Plaintiffs] and Gray's office regarding the effect of the [Plaintiffs'] move to Pennsylvania on the insurance policy. Additionally, all bills after May of 2015 were sent to a Pennsylvania address and the checks were sent from Pennsylvania to North Carolina to continue the coverage[.] The receipts for payment of premiums were sent from Defendant Gray's office to Pennsylvania.

Pls.' Br. at 11, ECF No. 21 (citing Complaint ¶¶ 32-33). Defendant Gray does not appear to dispute these facts but, in his view, they are insufficient to establish that he purposefully availed himself of doing business in Pennsylvania. The Court agrees.

"Federal courts have recognized that minimum contacts cannot be established via an insured's move to a forum state after the policy was issued." *Nat'l Grange Mut. Ins. Co. v. White*, 83 S.W.3d 530, 536 (Ky. 2002) (citing *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415 (10th Cir. 1988); *Hunt v. Erie Ins. Grp.*, 728 F.2d 1244, 1247 (9th Cir. 1984)). In *Rambo*, for example, the plaintiffs, residents of Alabama, insured their tractor-trailer with the defendant-insurer, a Georgia corporation. After the policy was purchased, the tractor-trailer was leased to an Alabama trucking company for use in cross-country hauling and, thereafter, the plaintiffs moved to Texas.

---

1. These facts were drawn from a declaration submitted by Defendant Gray. *See* ECF No. 9-3. "When a defendant files a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2), and supports that motion with affidavits, plaintiff is required to controvert those affidavits with his own affidavits or other competent evidence in order to survive the motion." *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 474-75 (D. Del. 1995) (citing *Time Share Vacation Club v. Atlantic Resorts*, Ltd., 735 F.2d 61, 63 (3d Cir. 1984)). Plaintiffs have not submitted any evidentiary materials to controvert the affidavit submitted by Defendant Gray. Instead, they rely on the averments in their complaint as sufficient to establish jurisdiction.

While the plaintiffs were living in Texas, the tractor-trailer was stolen in California, and the plaintiffs notified the defendant-insurer. After filing the claim, the plaintiffs moved to Oklahoma, where they eventually filed suit in the District Court for the Western District of Oklahoma for breach of contract and breach of the duty of good faith and fair dealing against the insurer and others. The plaintiffs asserted that jurisdiction was proper because the insurer had engaged in eight to ten telephone conversations with the plaintiffs after they moved to Oklahoma. That was not enough, according to the Tenth Circuit. *Id.* at 1418. "[T]elephone calls and letters may provide sufficient contacts for the exercise of personal jurisdiction," the court explained, but "the exercise of jurisdiction depends on the nature of those contacts." *Id.* On the facts before it, the court concluded that the defendant's contacts with Oklahoma were "fortuitous, resulting from the [plaintiffs'] change in residence *after* the insurance policy was issued and the claim was filed." *Id.* at 1420 (emphasis in original).

Likewise, in the *Hunt* case, the plaintiff, a Virginia resident, was injured in a car accident in Colorado while travelling to California. 728 F.2d at 1244. She was hospitalized in Colorado, during which time a dispute with the other driver's insurance company, Erie Insurance, arose. Before the issue was resolved, the plaintiff moved to California for rehabilitation. Eventually, she sued Erie Insurance in California for breach of contract and several torts, premising personal jurisdiction, *inter alia*, on the insurance company's mailing of insurance payments to California. *Id.* at 1248. The plaintiff also argued that the insurance company "committed a tort in California by mailing to that State its refusal to assume unlimited liability for [the plaintiff's] medical costs." *Id.* The Ninth Circuit Court of Appeals, however, disagreed "that the requisite minimum contacts are established because a plaintiff's move into a state requires the defendant to send communications into that forum." *Id.* As the court explained,

The mere fact that Erie communicated with [the plaintiff] in the state, and may have committed a tort in the exchange of correspondence, does not show that Erie purposefully availed itself of the privilege of conducting business in California. [The plaintiff's] move to California forced Erie to send mail to that State concerning her claim.

*Id.* at 1248.

Relying on these two cases, the Supreme Court of Kentucky reached the exact same result in *White*, 83 S.W. 3d at 535-36 – a case that is factually analogous to this case. White was killed in a car accident in Kentucky, and the driver of the other car was considered an underinsured motorist under Kentucky law. White's policy provided for $100,000 in UIM benefits. White acquired the policy in New York, and on the policy application, he listed a New York address and provided a New York driver's license. Moreover, the vehicles covered by the policy were registered in New York, and all of the premiums were paid from there. After the policy was issued, White moved to Kentucky, but prior to doing so, he allegedly informed his insurance agent's office manager of the move (though she later testified that she could not remember receiving any such notification). The insurance company paid White's wife $75,000, which it concluded was all that was owed under the policy. White's wife disagreed and filed suit in Kentucky claiming that she was entitled to additional UIM benefits and survivor's economic loss benefits.

The Kentucky Supreme Court, however, found personal jurisdiction lacking:

Appellant did not have "minimum contacts" with this Commonwealth. In fact, no contacts with this Commonwealth have been shown. The policy was bought and paid for in New York by New York residents. Appellant conducts no business in Kentucky, nor does it advertise here. Thus, Appellant never purposefully availed itself of conducting activities here. The only connection with this Commonwealth seems to be that White moved here after purchasing the policy, and it is questionable whether Appellant ever received legally sufficient notice of this move. The unilateral activity of the insured cannot satisfy the minimum contacts requirement. Furthermore, since it did not conduct business here, Appellant had no reason to believe it would be haled into court in Kentucky. It is therefore

patently unfair to force Appellant to come to this distant jurisdiction and defend this case.

*Id.* at 534-35. The court, moreover, found it immaterial whether Erie Insurance knew that White or his wife had moved to Kentucky. *Id.* at 535. "Even if [it] was aware that White had moved to Kentucky and that Appellee was already living there," the court explained, "[its] purported 'act' of not canceling the insurance policy would be strictly an act of omission," which did not amount to purposeful conduct directed at the forum. *Id.* at 536. According to the court, "the only act of commission" was "White's move to Kentucky after the purchase of the policy," so the court found it to be "irrelevant whether or not Appellant actually knew of the move." *Id.*

As Defendant Gray points out, the Superior Court of Pennsylvania came to the same conclusion in *Colmon v. Maryland Automobile Insurance Fund*, 574 A.2d 628 (Pa. Super. 1990). There, the plaintiff was injured in Pennsylvania while driving a car that was insured by Maryland Automobile Insurance Fund ("MAIF"), a "state agency . . . authorized to do business solely in the State of Maryland" and which "may provide insurance coverage only to Maryland residents for vehicles registered in the State of Maryland." *Id.* at 630. Finding that personal jurisdiction was lacking over MAIF, the Superior Court called it "quite clear that MAIF has never undertaken any action to purposely avail itself of issuing auto insurance policies outside of the state of Maryland to residents of any other state except Maryland." *Id.* at 631. The court stressed, as in the other cases discussed *supra*, that the insured's "unilateral action in driving the insured automobile into Pennsylvania and then permitting a Pennsylvania resident to operate the auto does not establish minimum contacts between MAIF and Pennsylvania." *Id.*

This Court is persuaded by the reasoning of these cases and others like them. *See, e.g.*, *Whittaker v. Medical Mut. of Ohio*, 96 F. Supp. 2d 1197, 1201 (D. Kan. 2000) ("Several courts have held that there is no personal jurisdiction over an insurance company which sends

communication into the forum state as a result of the insured's move out of the state after the policy was issued and the claim arose."). Making telephone calls to Plaintiffs after their move to Pennsylvania, receiving premium payments from Plaintiffs that were sent from Pennsylvania, and sending bills and receipts to Pennsylvania (assuming they were actually sent from Defendant Gray, as alleged) are not the type of contacts required to confer jurisdiction. Each of these contacts resulted because of Plaintiffs' unilateral decision to move to Pennsylvania, and not any activities of Defendant Gray that were directed at the forum. Indeed, as the Kentucky Supreme Court reasoned in *White*, even if Defendant Gray knew that Plaintiffs had moved to Pennsylvania, the same conclusion would be reached. Any alleged omission on Defendant Gray's part – in failing to advise Plaintiffs about the effect of their alleged move on their policy – "does not permit an inference that [Defendant Gray] was purposefully availing itself of conducting activities in [Pennsylvania]. Purposeful conduct is not demonstrated by the mere happenstance of a client's nomadic whims." *White*, 83 S.W. 3d at 536.

Plaintiffs' reliance on *Huth v. Hillsboro Insurance Management, Inc.*, 72 F. Supp. 2d 506 (E.D. Pa. 1999), does not convince the Court otherwise. In that case, the defendant insurance agency, a Wisconsin resident, "solicited, recommended, and negotiated a policy in Pennsylvania," and the court found those contacts sufficient. *Id.* at 510. Here, though, Defendant Gray did not solicit any business from Pennsylvania residents; the policy was negotiated in North Carolina while Plaintiffs were residents of that state. Thus, *Huth* is plainly distinguishable. *See Rambo*, 839 F.2d at 1420 (distinguishing its facts "from the common case where an insurance company has solicited the defendant's business in the forum state").

Plaintiffs also appear to argue, without much elaboration, that they have established personal jurisdiction over Defendant Gray under the *Calder* "effects test." The Court cannot

agree. As the Third Circuit Court of Appeals has made clear, "[t]he effects test and traditional specific jurisdiction analysis are different, but they are cut from the same cloth." *Marten*, 499 F.3d at 297. Like the traditional test for specific jurisdiction, the "effects test" "prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state." *Id.* (citing *Burger King*, 471 U.S. at 475). Even assuming that the brunt of Plaintiffs' harm was felt in Pennsylvania, they have failed to demonstrate that Defendant Gray "deliberate[ly] target[ed]" Pennsylvania in any manner. *Id.* at 289 (citing *IMO Indus.*, 155 F.3d at 265-66). Accordingly, Defendant Gray's motion to dismiss for lack of personal jurisdiction will be granted, and the claims against him will be dismissed without prejudice to Plaintiffs' ability to refile them in the appropriate jurisdiction.

### III.    State Farm's Motion to Transfer Venue

#### A.    Legal Standard

Under Section 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." When deciding a motion to transfer under § 1404(a), the Court is "vested with wide discretion." *Plum Tree, Inc. v. Stockment*, 488 F.2d 754, 756 (3d Cir. 1973). In exercising that discretion, the Court should "'consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.'" *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 879 (3d Cir. 1995) (quoting 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 3847 (2d ed. 1986)). There is no set formula, but in general, "courts have considered many variants of the private and public interests

protected by the language of § 1404(a)." *Id.* The private interests include (1) plaintiff's choice of forum; (2) "the defendant's preference;" (3) where the claim arose; (4) "the convenience of the parties as indicated by their relative physical and financial conditions;" (5) "the convenience of the witnesses – but only to the extent that the witnesses may be unavailable for trial in one of the fora;" and (6) the location of the relevant books and records. *Id.* (citations omitted). The public interest factors include (1) "the enforceability of the judgment;" (2) "practical considerations" regarding trial; (3) docket congestion in the competing fora; (4) interests in deciding local controversies at home; (5)" the public policies of the fora;" and (6) "the familiarity of the trial judge with the applicable state law in diversity cases." *Id.*

"In ruling on defendants' motion," the Court must also be mindful that "the plaintiff's choice of venue should not be lightly disturbed." *Id.* (citation and quotation marks omitted). Indeed, the plaintiff's "choice of a proper forum is a paramount consideration in any determination of a transfer request." *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970). "In accord with that sound doctrine . . . a transfer is not to be liberally granted." *Id.* (citation and quotation marks omitted). The burden is thus on the moving party to establish that the interest of justice would be served by transferring the case. *Jumara*, 55 F.3d at 879 (citations omitted). "[U]nless the balance of convenience of the parties is strongly in favor of defendant, the plaintiff's choice of forum should prevail." *Shutte*, 431 F.2d at 25 (quotation marks omitted).

**B.    Discussion**

**1.    Private Interest Factors**

Five of the six private factors from *Jumara* appear to be in dispute. Thus, the Court will limit its discussion to those five factors.

**a.    Plaintiffs' Choice of Forum**

The plaintiff's choice of forum is usually entitled to significant weight. "Nevertheless," as State Farm argues, "it has been repeatedly recognized that a plaintiff's choice of forum receives less weight where . . . none of the operative facts occurred there." *Costello v. Novartis Pharm. Corp.*, No. CIV.A. 05-3841, 2006 WL 1479800, at *2 (E.D. Pa. May 25, 2006) (collecting cases). Here, the operative facts occurred outside of this District, either in North Carolina (where the policy was negotiated and issued) or in the location where State Farm decided to deny coverage (likely Atlanta, where State Farm's claims department is based). *See, e.g.*, *Toll Bros. v. Nationwide Prop. & Cas. Ins. Co.*, No. 05-1191, 2005 WL 2600207, at *3 (E.D. Pa. Oct. 13, 2005) (declining to "accord 'paramount consideration' to [plaintiff's] choice of forum because, although [the plaintiff] resides in Pennsylvania, the situs of the negotiation, contracting, and performance of the insurance contract appears to be in Ohio"). It is true that the accident that injured Rafael Alcantarilla occurred here, but "[i]t is not uncommon for an insurance coverage contract dispute to be located in a different forum from that of the underlying claim." *Transcon. Ins. Co. v. Coreslab Structures (OKLA) Inc.*, No. 3:01-CV-2589-M, 2002 WL 570880, at *2 n.8 (N.D. Tex. Apr. 12, 2002) (collecting cases). Ultimately, then, Plaintiffs' choice of forum is not controlling because the operative facts occurred outside of this District, though it is still entitled to some weight.

### b.     Defendant's Preference

"Defendant's preference is entitled to considerably less weight than Plaintiff's, as the purpose of a venue transfer is not to shift inconvenience from one party to another." *EVCO Tech. and Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D. Pa. 2003) (citations omitted). That is especially true in this case because Defendant has no apparent ties to North Carolina that it does not also have to Pennsylvania. Thus, this factor weighs in favor of

transfer, but only so slightly.

### c. Where the Claim Arose

The most appropriate venue is generally "where a majority of events giving rise to the claim arose." *In re Amkor Tech, Inc. Sec. Litig.*, No. 06-298, 2006 WL 3857488 (E.D. Pa. Dec. 28, 2006). (citation omitted). "When the chosen forum has little connection with the operative facts of the lawsuit, such that retaining the action conflicts with the interests in efficiency and convenience, other private interests are afforded less weight." *Cancer Genetics, Inc. v. Kreatech Biotech.*, No. Civ.A.07–273, 2007 WL 4365328, at *5 (E.D. Pa. Dec. 11, 2007) (citations omitted). As already discussed, none of the events giving rise to Plaintiffs' claim occurred in Pennsylvania. The breach of contract and bad faith claims, which are based on State Farm's decision to deny coverage, arose where the decision to deny coverage was made. *See, e.g.*, *Evangelical Lutheran Church in Am. v. Atl. Mut. Ins. Co.*, 973 F. Supp. 820, 823 (N.D. Ill. 1997) (finding that the event underlying the parties' insurance coverage dispute was the insurance company's "decision to deny coverage," which was made at the insurer's corporate office in New York). And the other claims, related to the alleged misrepresentations of Defendant Gray or his office manager, Ms. McMillian, arose in North Carolina. Once again, it is immaterial that the underlying accident occurred in Pennsylvania; the parties' dispute focuses on the terms of the insurance policy and not the facts of the underlying accident. *See Transcon. Ins. Co.*, 2002 WL 570880, at *2 n.8. Thus, this factor weighs in favor of transfer.

### d. Convenience of the Parties

State Farm has not advanced any argument as to why it would be less convenient to defend this lawsuit in Pennsylvania instead of North Carolina. Since State Farm does business in both states and is well accustomed to conducting litigation throughout the country, it does not

appear that it would suffer any inconvenience by having to litigate here. *See Motorola, Inc. v. Research-in-Motion Ltd.*, No. 08-104-SLR, 2008 WL 3925278, at *2 (D. Del. Aug. 26, 2008). On the other hand, being forced to litigate this case in North Carolina could cause real hardship for Plaintiffs because they have severed their ties with North Carolina by moving to Pennsylvania. Therefore, this factor strongly weighs against transfer. *See Lemberger v. Westinghouse Elec. Corp.*, No. 76-C-552(JW), 1976 WL 834, at *4 (E.D.N.Y. Nov. 1976) (citations omitted). ("Where parties with limited financial means sue large corporate defendants for events which affected the plaintiffs in their local existences, courts are understandably reluctant to allow a transfer.").

### e. Convenience of the Witnesses

"Traditionally, the location of potential witnesses and, thus, their ability to be subject to compulsory process has weighed heavily in the 'balance of convenience' analysis." *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 203 (D. Del. 1998) (citing 15 Wright, Miller & Cooper § 3851). However, "when considering the convenience of the witnesses, a court must 'scrutinize the substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of the evidence cited by the parties are critical, or even relevant, to the plaintiff's cause of action and to any potential defenses to the action.'" *DePuy Synthes Sales, Inc. v. Gill*, No. CIV.A. 13-04474, 2013 WL 5816328, at *9 (D.N.J. Oct. 29, 2013) (quoting *Kelly-Brown v. Winfrey*, No. CIV.A. 11-4360 SRC, 2011 WL 5325596, at *4 (D.N.J. Nov. 3, 2011)). Since this case ultimately boils down to the choice-of-law question, it seems highly unlikely that extensive witness testimony will be required. Thus, the Court is hesitant to give this factor any weight.

Insofar as anyone's testimony will be required, it will likely be that of Ms. McMillian,

Defendant Gray's office manager. (Her testimony, however, would only become relevant if the Court finds against Plaintiffs' on the choice-of-law question.). While State Farm claims that it could not compel her to appear, the Court disagrees. It would seem that State Farm would have little difficulty compelling her to testify since she is, as State Farm concedes, the employee of an agent of State Farm. *Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d at 203 ("Party witnesses or witnesses who are employed by a party carry no weight in the 'balance of convenience' analysis since each party is able, indeed, obligated to procure the attendance of its own employees for trial."). *Id.*

## 2. Public Factors

The Court will only address the three public interest factors – practical considerations, which forum has the stronger interest in deciding this dispute, and the familiarity of the trial judgment with the applicable state law – that the parties appear to dispute. The other public interest factors will not be given any weight in the Court's analysis, as they have not been discussed by the parties.

### a. Practical Considerations

State Farm has not identified any reason why it would be more difficult or expensive, and less expeditious, to litigate this case in the Middle District of North Carolina instead of this District. Instead, it argues that if the claims against Defendant Gray are dismissed without prejudice to Plaintiffs' ability to refile in North Carolina – which they have been – then the claims against State Farm should be transferred to North Carolina, to avoid the possibility of duplicative lawsuits in the event that Plaintiffs re-file against Defendant Gray in North Carolina. This factor does indeed weigh in State Farm's favor. *See Cont'l Cas. Co. v. Staffing Concepts, Inc.*, No. 06 C 5473, 2009 WL 3055374, at *7 (N.D. Ill. Sept. 18, 2009) (citations omitted)

(explaining that "a district court has an interest in efficiency and avoiding the possibility of multiplicity of litigation"). It would make sense to allow the claims against Defendants Gray and State Farm to proceed in the same forum. However, since Plaintiffs have not actually re-filed their claims against Defendant Gray in North Carolina, the risk of duplicative litigation is still inchoate. Plaintiffs may eventually decide not to pursue the claims against him, for the cost and inconvenience of doing so in North Carolina might be too great for them to bear. This diminishes the amount of weight this factor should be accorded at this time.

### b.    Local Interest in Deciding Local Controversies

State Farm argues that "this case is a North Carolina-based controversy" so "'the local interest in deciding local controversies' weighs in favor of transfer to the Middle District of North Carolina." Defs. Br. at 5, ECF No. 14. Plaintiffs take issue with that characterization for a variety of reasons. As they see it,

> North Carolina has no interest in a contractual dispute between Pennsylvania residents and an Illinois-based insurance company. Additionally, the issue of whether the [Plaintiffs], as Pennsylvania residents, are entitled to UIM coverage under their policy as a result of a collision which happened in Pennsylvania, even where their insurance policy was initially issued in another state, is of concern only to Pennsylvania.

Pls.' Br. at 13-14, ECF No. 23. According to Plaintiffs, Pennsylvania's interest in deciding this dispute is evidenced by the fact that it has enacted legislation requiring insurers to offer UIM coverage. *Id.* at 14 (citing 75 Pa. C.S. § 1701; *Nationwide Ins. Co. v. Resseguie*, 980 F.2d 226, 231 (3d Cir. 1992)). Additionally, Plaintiffs argue, Pennsylvania has had to manage the repercussions from the accident since Rafael Alcantarilla's medical bills were paid by Pennsylvania Medicaid, which suggests that Pennsylvania has a greater interest in the resolution of this case than does North Carolina. *Id.* at 15.

The Court agrees with Plaintiff that this case cannot be viewed simply as a "North

Carolina-based controversy." North Carolina's interest greatly diminished once Plaintiffs moved to Pennsylvania. *See Amica Mut. Ins. Co. v. Fogel*, 656 F.3d 167, 178 (3d Cir. 2011). The only tie that North Carolina retains to this action is that the insurance policy at issue was written in accordance with North Carolina law and contains a choice-of-law provision applying North Carolina law. North Carolina, however, has no real interest in seeing that its laws govern insurance coverage disputes between residents of another state and an out-of-state insurance company. Pennsylvania, on the other hand, does appear to have a fairly strong interest in this case since it has a public policy, evidenced through its enactment of the MVFRL, of providing injured claimants with "the greatest possible coverage," including when it comes to UIM coverage. *Allwein v. Donegal Mut. Ins. Co.*, 671 A.2d 744, 750 (Pa. Super. Ct. 1996). Therefore, this factor weighs in Plaintiffs' favor.

### c. Familiarity of Judge with the Applicable Law

Finally, State Farm contends that this case should be transferred because a North Carolina-based federal judge will have more familiarity applying North Carolina law, which State Farm argues will ultimately govern the parties' dispute. The policy does contain a choice-of-law provision applying North Carolina law. If this case is transferred, however, the transferee court will still be required to apply Pennsylvania's choice-of-law rules, including that which relate to the validity of the parties' choice-of-law provision, to decide which state's substantive law applies. *See Fogel*, 656 F.3d at 171 (quoting *Lafferty v. St. Riel*, 495 F.3d 72, 76-77 (3d Cir. 2007)) ("When 'faced with a choice-of-law question, federal courts in the district to which the case has been transferred under § 404(a) must apply the law of the transferor state.'"). These rules can be "quite complex" – a factor which militates against transferring the case to a North Carolina federal court that might be unfamiliar with them. *See, e.g., RX Returns, Inc. v. PDI*

*Enterprises, Inc.*, No. CIV. A. 97-1855, 1997 WL 330360, at *7 n.6 (E.D. Pa. June 6, 1997) (declining to transfer case to California where California court would be required to apply Pennsylvania choice-of-law rules).

Once the thorny choice-of-law question is resolved, however, the remaining issues will be relatively straightforward no matter which substantive state law applies. The breach of contract claim rises and falls with the determination of which state law applies – either Plaintiffs were entitled to excess UIM coverage, or they were not entitled to such coverage. As for the other claims, as State Farm recognizes in its brief in support of its motion to dismiss, Pennsylvania and North Carolina are quite similar when it comes to what constitutes bad faith and whether a fiduciary relationship arises between an insurer and the insured. This Court and the District Court in the Middle District of North Carolina are equally well equipped to address these issues. Thus, even assuming for the moment that the choice-of-law provision is enforceable and North Carolina law will govern each of Plaintiffs' claims, the Court does not find that this factor weighs in favor of transfer. *See* 15 Wright, Miller, & Copper, *Federal Practice and Procedure* § 3854 ("[This factor] is given significantly less weight . . . when the case involves basic or well-established, as opposed to complex or unsettled, issues of state law or when there is no reason to believe that the applicable law of the forum differs markedly from the law of the proposed transferee state.").

C.    <u>Summary</u>

The private factors weigh in Plaintiffs' favor. They now reside in Pittsburgh, they chose to litigate here, and they would likely be inconvenienced by having to litigate in the Middle District of North Carolina, where they no longer own a home. State Farm, by contrast, is a large corporation with no apparent ties to North Carolina that it does not also have with Pennsylvania.

So, unlike Plaintiffs, State Farm would not be inconvenienced by having to litigate here. In fact, a quick search of this Court's electronic docket reveals that State Farm has done so on countless occasions over the years. Furthermore, there will be little inconvenience to non-party witnesses if this case is litigated here instead of in North Carolina. Finally, while the claims did not arise in Pennsylvania, that factor, alone, is not sufficient to overcome the factors that support retaining this case in the Western District of Pennsylvania.

The public interest factors likewise weigh slightly in Plaintiffs' favor. There are no practical considerations that suggest the case should be transferred, Pennsylvania has a stronger interest in deciding this dispute than does North Carolina, and, even assuming that North Carolina law applies, the District Court for the Middle District of North Carolina is no more capable of resolving the substantive legal questions involved than is this Court.

In sum, then, the Court concludes that Defendant State Farm has failed to "strongly" tilt the balance of factors in its favor. *See Shutte*, 431 F.2d at 25 (quotation marks omitted). Accordingly, State Farm's motion to transfer will be denied.

## IV. State Farm's Motion to Dismiss

### A. Legal Standard

A Rule 12(b)(6) motion to dismiss challenges the legal sufficiency of a complaint, which may be dismissed for the "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Upon review of a motion to dismiss, the Court must accept all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 220 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1861 (2012) (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010)). However, such "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell*

*Atlantic Corp. v. Twombly* 550 U.S. 554, 555 (2007). The Supreme Court later refined this approach in *Ashcroft v. Iqbal*, emphasizing the requirement that a complaint must state a plausible claim for relief in order to survive a motion to dismiss. 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 555). Nevertheless, "the plausibility standard is not akin to a 'probability requirement,'" but requires a plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 555).

To determine the legal sufficiency of a complaint after *Twombly* and *Iqbal,* the United States Court of Appeals for the Third Circuit instructs that a district court must take a three step approach when presented with a motion to dismiss for failure to state a claim. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 n.7 (3d Cir. 2010). First, "the court must "tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* at 130 (quoting *Iqbal*, 556 U.S. at 675) (alteration in original). Second, the court "should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). Third, "'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

Accordingly, the Court must separate the factual and legal elements of the claim and "accept the factual allegations contained in the Complaint as true, but [ ] disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements." *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Iqbal*, 556 U.S. at 678-79; *Twombly*, 550 U.S. at 555-57; *Burch*, 662 F.3d at 220-21). The Court "must then determine

whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.' In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (citing *Iqbal* 556 U.S. at 678).

**B.**     **Discussion**

**1.**     **Breach of Contract**

The gist of Plaintiffs' breach of contract claim is that State Farm improperly denied their UIM claim because the policy should be governed by Pennsylvania law and not North Carolina law. North Carolina law, which has been incorporated into the policy itself, treats UIM insurance as "gap" coverage. Under this theory, "a driver is considered 'underinsured' when his liability coverage does not at least equal the uninsured/underinsured coverage carried by the injured insured." *North River Ins. Co. v. Tabor*, 934 F.2d 461, 464 (3d Cir. 1991) (citations omitted). "[T]he [UIM] coverage merely fills the 'gap' between the tortfeasor's liability coverage and the injured party's [UIM] coverage." *Id.* Because the driver's coverage ($100,000) equaled the amount of Plaintiffs' UIM coverage ($100,000), Plaintiffs would not be entitled to any UIM benefits under North Carolina law and the terms of the policy. If, however, Pennsylvania law applies, Plaintiffs would be entitled to an additional $100,000 because Pennsylvania is an "excess" coverage jurisdiction. *See Allwein*, 671 A.2d at 750; 75 Pa. C.S. § 1702. In such jurisdictions, "[t]he insured may . . . recover underinsured motorist benefits until his policy limits are reached or he is fully compensated for his damages, whichever comes first." *Tabor*, 934 F.2d at 464 (citations omitted). In other words, "a tortfeasor is 'underinsured' when his liability coverage does not at least equal the damages suffered by the injured insured." *Id.*

This situation presents the Court with an actual conflict between the laws of North

Carolina and Pennsylvania. *See State Farm Mut. Auto. Ins. Co. v. Kaplan*, No. CIV. A. 93-3913, 1994 WL 276401, at *4 (E.D. Pa. June 21, 1994) ("[I]t is clear that Virginia law and Pennsylvania law conflict on the issue of underinsured motorist insurance" since "Virginia treats underinsured motorists insurance as 'gap' coverage, whereas Pennsylvania treats it as 'excess' coverage."). To decide which state's law should govern, the Court must "apply the choice-of-law rules of the forum state, which is Pennsylvania in this case." *Pac. Employers Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Fogel*, 656 F.3d at 170-71). Under Pennsylvania law, the threshold question "in addressing a potential conflict of laws dispute is whether the parties explicitly or implicitly have chosen the relevant law." *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164 (3d Cir. 1999). The parties in this case have done so: the policy states that North Carolina law will apply. That provision must be given effect

> unless: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 463 (3d Cir. 2006) (quoting *Restatement (Second) of Conflicts of Law* § 187(2) (1971)).

As the discussion to this point has indicated, North Carolina had a substantial relationship to the policy – at least when the policy was issued – since that is where the policy was negotiated and issued and where Plaintiffs resided at the time they purchased the policy. Thus, the Court will focus on whether part (b) is satisfied. This requires the Court to consider three separate questions: (1) whether the application of North Carolina law would be contrary to a fundamental

policy of Pennsylvania, (2) whether Pennsylvania has a materially greater interest than North Carolina when it comes to the issue of UIM coverage under the policy, and (3) whether Pennsylvania's law would apply in the absence of the parties' choice-of-law provision. The latter two inquiries are related insofar as Pennsylvania takes governmental interest into account when deciding which state's law to apply. *See Fogel*, 656 F.3d at 178 (quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226-27 (3d Cir. 2007)).

As to the first question, there is no hard-and-fast way to decide what constitutes a "fundamental policy." *Restatement (Second) of Conflicts of Laws* § 187 cmt. g. "To be 'fundamental,' a policy must . . . be a substantial one." *Id.* It "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Id.* "Statutes involving the rights of an individual insured as against an insurance company are an example of this sort." *Id.* Consistent with the approach endorsed by the *Restatement*, under Pennsylvania law, "'[p]ublic policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest.'" *Hall v. Amica Mut. Ins. Co.*, 648 A.2d 755, 760 (Pa. 1994) (quoting *Muschany v. United States*, 324 U.S. 49, 66-67 (1945)). As the Superior Court of Pennsylvania has recognized, there is "clear statutory language" evincing "Pennsylvania's public policy on the issue of 'excess' versus 'gap' coverage[.]" *Allwein*, 671 A.2d at 754. "'Under the MVFRL, insurers must offer underinsured motorist coverage, and that coverage is controlled by statute and by a public policy meant to foster the fullest possible, or 'excess,' coverage.'" *Id.* at 752 (quoting *Tabor*, 934 F.2d at 465). Permitting an insurer to only provide "gap" coverage would violate this clear public policy in favor of providing "excess" coverage when an insured is injured by an underinsured third-party. *See id.* at 753-55 (concluding that "gap" provision in an

insurance policy violated Pennsylvania's public policy in favor of "gap" coverage and thus was invalid). As a result, the first requirement is met.

Second, Pennsylvania has a "materially greater interest" than North Carolina in having its UIM law applied in this case. As already noted when discussing the motion to transfer, Pennsylvania has a strong interest in ensuring that its injured residents are afforded the "greatest possible coverage." *Id.* at 750. These policy interests outweigh any interest that North Carolina still has in this dispute. *See Fogel*, 656 F.3d at 178.

Third, if the policy did not contain a choice-of-law provision, Pennsylvania law would apply. Pennsylvania's approach to choice-of-law questions combines the "'approaches of both *Restatement II* (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy).'" *Hammersmith*, 480 F.3d at 231 (quoting *Melville v. Am. Home Assur. Co.*, 584 F.2d 1306, 1311 (3d Cir. 1978)). "When the underlying issue involves a contract, such as an insurance policy, the court looks to the contacts each state has with the underlying transaction involving the policy, not to the contacts with the tort giving rise to the dispute." *Esurance Ins. Servs., Inc. v. Weber*, 30 F. Supp. 3d 351, 356 (E.D. Pa. 2014) (citing *Hammersmith*, 480 F.3d at 226-27). Moreover, "[t]he restatement includes a contacts test specific to contracts of fire, surety, or casualty insurance, which provides: 'The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy. . . .'" *Travelers Indem. Co. v. MTS Transp., LLC*, No. 11-CV-01567, 2012 WL 3929810, at *8 (W.D. Pa. Sept. 7, 2012) (quoting *Restatement (Second) of Conflicts of Law* § 193). According to the comments to § 193, however, "the importance of the principal location of the insured risk diminishes when the

insured object is a moveable chattel, such as a motor vehicle." *Fogel*, 656 F.3d at 173 (quoting *Restatement (Second) of Conflicts of Law* § 188). Furthermore, "on 'occasions when following the issuance of the policy the principal location of the risk is shifted to some other state,' the 'other state will have a natural interest in the insurance of the risk and it may be that its local law should be applied to determine at least some of the issues under the policy.'" *Id.* (quoting *Restatement (Second) of Conflict of Laws* § 193 cmt. d).

"When a specific section such as section 193 does not apply, the court must look to the general contacts test, which is set forth in section 188[.]" *Travelers*, 2012 WL 3929810, at *8. "In determining which state has the most significant relationship, § 188 instructs courts to evaluate each state's contacts, 'according to their relative importance,' such as the place of contracting and performance, the location of the subject matter of the contract, and the domicile, residence, nationality, place of incorporation and place of business of the parties." *Fogel*, 656 F.3d at 172 (3d Cir. 2011) (quoting *Restatement (Second) of Conflicts of Law* § 188).

The Court's application of these principles is guided by the Third Circuit Court of Appeals' decision in *Fogel*.[2] The issue there was whether New Jersey or Pennsylvania law with respect to "stacking" of UIM benefits applied to an insurance policy that was issued in New Jersey when the Fogels resided in that state but later moved to Pennsylvania without changing their policy. *Id.* at 168. The policy provided $300,000 in UIM coverage for two vehicles. *Id.* Under Pennsylvania law, UIM benefits may be "stacked": "the insured may add together the

---

2.      State Farm argues that *Fogel* is inapposite, *inter alia*, because the Court of Appeals applied New Jersey conflict-of-law principles. This is true. Nevertheless, those principles are similar to Pennsylvania's, *Berrodin v. Med. Components, Inc.*, No. CIV.A.03-5572, 2004 WL 2260671, at *5 (E.D. Pa. Oct. 7, 2004), since both take into account the contacts analysis set forth in the *Restatement (Second) of Conflicts of Law*, particularly §§ 188 and 193, *Travelers Indem. Co. v. MTS Transp., LLC*, No. 11-CV-01567, 2012 WL 3929810, at *8 (W.D. Pa. Sept. 7, 2012) ("The first step in the ["interest/contacts"] test is the application of the Restatement (Second) of Conflict of Laws (1971)."). In fact, in reaching its decision, the Court of Appeals relied, in part, on *Parker v. State Farm Ins. Co.*, 543 F. Supp. 806 (1982), which applied Pennsylvania choice-of-law principles, including sections 188 and 193, to arrive at the same conclusion reached in *Fogel*. The Court thus finds it appropriate to consider the Third Circuit's analysis as persuasive authority on the application of the contacts inquiry.

policy limits for each of the covered vehicles even though the collision involved only one of the covered vehicles." *Id.* at 169. Stacking is not permitted in New Jersey, however. *Id.* "During [the policy's] term, the Fogels moved to Pennsylvania, and made Amica aware of their permanent relocation, before they were involved in a fatal traffic accident in Pennsylvania that triggered the policy claim to Amica." *Id.* Following the accident, the Fogels claimed that they were entitled to stacked UIM benefits of $600,000, but Amica denied the claim since stacking was not allowed under the terms of the Fogels' New Jersey policy. *Id.*

In resolving the choice-of-law question, the Court of Appeals focused on § 193 of the *Restatement (Second)*, and particularly "whether the parties *understood* that the principal location of the insured risk was Pennsylvania" prior to the accident. *Id.* at 175 (emphasis in original). "In other words," the Court of Appeals explained, "the issue is not whether the policy was rewritten as a Pennsylvania policy before the accident[;]" instead, the main consideration must be "what the parties believed regarding where the risk would be located." *Id.* In the Court of Appeals' view, "the justified expectations of the parties shifted when Amica was put on notice that the Fogel family had permanently relocated to Pennsylvania. Because the Fogels had notified Amica of their move . . . , garaged and were primarily driving their cars in Pennsylvania, and were being billed by Amica in Pennsylvania," the Court of Appeals found "it difficult to believe that any party could have believed the primary location of the insured risk was still New Jersey by the time the accident occurred." *Id.* The Court of Appeals also "conclude[d] that Pennsylvania's underlying policy interests predominate[d]," which weighed in favor of applying Pennsylvania law. *Id.* at 177. As the Court of Appeals put it, "[a]lthough New Jersey has some interest in the Fogels' policy – as the place of contracting and the initial location of both parties – after the Fogels notified Amica of their relocation to Pennsylvania, there was no longer a

justified expectation that New Jersey remained the principal location of the insured risk." *Id.*

Applying the principles outlined above, the same result must obtain in this case. Accepting Plaintiffs' allegations as true, Plaintiffs made it known to State Farm, through its agent, Defendant Gray, that the principal location of the insured risk (their vehicle) had permanently moved from North Carolina to Pennsylvania before the accident.[3] After Plaintiffs informed Defendant Gray's office manager of their move, State Farm sent bills to Plaintiffs in Pennsylvania, Plaintiffs' paid their premium from Pennsylvania, and their receipts were sent to Pennsylvania. Thus, as in *Fogel*, no one could have reasonably believed that the insured risk was still principally located in North Carolina, and Pennsylvania, in turn, has the most significant contacts with the transaction giving rise to this case. Furthermore, for the reasons already explained, Pennsylvania's interest in applying its "excess" coverage rule outweighs any residual interest North Carolina has in this dispute. Accordingly, the third and final requirement for invalidating the choice-of-law provision has been satisfied.

State Farm argues, however, that the provisions in the MVFRL do not apply because the policy at issue was not "delivered or issued for delivery" in Pennsylvania "for a vehicle registered or principally garaged" here. Defs.' Br. at 7, ECF No. 12 (quoting 75 Pa. C.S. § 1731). Thus, State Farm contends that there is not really a conflict to address. To be sure, the Pennsylvania Superior Court has held on multiple occasions that Section 1731(a) "does not require insurance policies issued or delivered in other states for vehicles licensed in those states to include underinsured motorist coverage." *Ins. Co. of State of Penn. v. Hampton*, 657 A.2d 976 (Pa. Super. Ct. 1995); *Bamber v. Lumberman's Mut. Cas. Co.*, 680 A.2d 901 (Pa. Super. Ct.

---

3.     State Farm also attempts to distinguish *Fogel* on the ground that Plaintiffs here never inquired about their coverage with State Farm. This makes no difference, however, because Plaintiffs did allegedly inform Defendant Gray of their move, and Defendant Gray was acting as State Farm's agent. *See Nations First Mortg., LLC v. Tudor Ins. Co.*, No. 3:CV-05-2527, 2009 WL 3182967, at *7 (M.D. Pa. Sept. 30, 2009) (explaining the general rule than an agent's knowledge will be imputed the principal).

1996). State Farm, however, is reading too much into these cases. They are based on an interpretation of 1731(a), a provision titled, "Mandatory offering." As such, they stand for the proposition that courts should not read UIM coverage into a policy that was issued outside of Pennsylvania for a vehicle that was not registered or principally garaged in Pennsylvania when none exists under the terms of the policy. If the policy is not issued in Pennsylvania, then UIM coverage need not be offered under § 1731(a). *See id.* ("Since section 1731(a) of the PMVFRL did not require Kemper to offer UIM benefits in the Chamber policy, we have no basis upon which to reform the policy."). Contrary to what State Farm seems to suggest, though, these cases do not hold that Pennsylvania law should not determine the scope of already-existing UIM coverage, when applying another state's law would conflict with Pennsylvania law on the issue. *Fogel* supports this view. In that case, the Third Circuit Court of Appeals made no mention of the potential inapplicability of the stacking provision of the MVFRL to the policy at issue, which was issued in New Jersey and not Pennsylvania. If State Farm's argument were correct, one would have expected that the Court of Appeals would have addressed the question before engaging in the choice-of-law analysis to determine which state's law applied to the policy, which was concededly issued outside of Pennsylvania. For these same reasons, the Court is not persuaded by the Eastern District's decision in *Grange Mutual Casualty Insurance Co. v. Pinto*, No. CIV.A. 00-CV-257, 2000 WL 669635 (E.D. Pa. 2000), upon which State Farm relies.

To recap, the Court holds that irrespective of the choice-of-law provision, Pennsylvania law should govern the terms of the policy. Pennsylvania has the most relevant contracts to the coverage dispute and it has the greatest interest in having its law applied. In view of that, State Farm's motion to dismiss Plaintiffs' breach of contract claim will be denied.

### 2. Bad Faith

While the Court will not dismiss the breach of contract claim, the Court nonetheless finds that Plaintiffs' allegations of bad faith fail as a matter of law. [A]n insurer may defeat a claim of bad faith by showing that it had a reasonable basis for its actions." *Fogel*, 656 F.3d at 179. The Court of Appeals in *Fogel* addressed almost identical allegations of bad faith under Pennsylvania law and found that "the conduct alleged simply does not amount to bad faith." *Id.* Accordingly, Plaintiffs' bad faith claim will be dismissed.

### 3. UTPCPL and Breach of Fiduciary Duty

Plaintiffs' UTPCPL and breach of fiduciary duty claims are plead in the alternative. That is, as Plaintiffs recognize, "if the court determines State Farm was required to make UIM benefits payments under the terms of the policy, then it cannot be said that Defendants' agent misrepresented the terms of the policy when the [Plaintiffs] contacted his office after they had moved to Pennsylvania." Pls.' Br. at 19, ECF No. 19. Since the Court has determined that State Farm was required to provide "excess" coverage under the policy, Plaintiffs' UTPCPL and breach of fiduciary duty claims will be dismissed.

## V.  <u>Conclusion</u>

For the reasons hereinabove stated, Defendant Gray's motion to dismiss will be granted; State Farm's motion to transfer will be denied; and State Farm's motion to dismiss will be granted in part, and denied in part. Specifically, the motion will be denied as it relates to the breach of contract claim, and granted in all other respects. An appropriate order follows.

McVerry, S.J.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RAFAEL ALCANTARILLA and JEAN ALCANTARILLA, *his wife*, | )<br>)<br>) |
| Plaintiffs, | )<br>) **2:15-cv-1155** |
| v. | )<br>)<br>) |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and ALLAN GRAY, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |

**ORDER**

AND NOW, this 15th day of December, 2015, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

(1) the MOTION TO DISMISS PLAINTIFF'S COMPLAINT AGAINST ALLAN GRAY (ECF No. 9) filed by Defendant Allan Gray is **GRANTED** without prejudice because the Court lacks personal jurisdiction over Defendant Gray;

(2) the MOTION TO DISMISS (ECF No. 11) filed by Defendant State Farm Mutual Automobile Insurance Company is **GRANTED IN PART**, insofar as it relates to the bad faith, UTPCPL, and breach of fiduciary duty claims, and **DENIED IN PART**, insofar as it relates to the breach of contract claim; and

(3) the MOTION TO TRANSFER VENUE AS TO STATE FARM (ECF No. 13) is **DENIED**.

Defendant shall file an Answer **on or before December 29, 2015**. The parties shall confer as necessary and file with the Court the Stipulation Selecting ADR Process and the Rule 26(f) Report **on or before January 26, 2016**. The Initial Case Management Conference is

hereby **SCHEDULED** on **February 12, 2016, at 9:30 a.m.** in Courtroom 6C.

BY THE COURT:

s/Terrence F. McVerry
Senior United States District Judge

cc:    **Kenneth R. Behrend, Esquire**
Email: behrendlawyers@aol.com

**Robert E. Dapper , Jr., Esquire**
Email: rdapper@d3bk.com

**Daniel J. Twilla, Esquire**
Email: dtwilla@d3bk.com